AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Indiana

| | |
|---|---|
| United States of America<br>v.<br><br>MARTIAL ATCHIKPA<br><br>*Defendant(s)* | )<br>)<br>) Case No.<br>)          1:18-MJ-0232<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __June 21, 2017 - March 13, 2018__ in the county of _____Marion_____ in the ___Southern___ District of ___Indiana___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1029(a)(2) and (a)(5) | Access Device Fraud |
| 18 U.S.C. § 1029(b)(2) | Conspiracy to Commit Access Device Fraud |

This criminal complaint is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Justin Adams, Postal Inspector, USPIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __03/13/2018__

_____
*Judge's signature*

City and state: ___Indianapolis, IN___

Mark J. Dinsmore, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Justin Adams, Postal Inspector, United States Postal Inspection Service, having been duly sworn under oath, state as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1. I am a Postal Inspector ("PI") with the United States Postal Inspection Service ("USPIS") and have been so employed since February of 2014. I am currently assigned to the Indianapolis Field Office (part of the Detroit Division) External Crimes Team. As part of my job, I am responsible for investigating various federal crimes, including assault on federal officers, robberies, burglaries, mail theft, identity theft, and access device fraud. I attended the Postal Inspector Basic Training Academy, where I was trained in various law enforcement methods, including physical surveillance, interviewing, and financial analysis. I have participated in executing arrest warrants and search warrants. Before joining USPIS, I was employed as a Federal Air Marshal and Explosive Detection Canine Handler with the Department of Homeland Security for approximately two years and one and a half years, respectively.

2. This Affidavit is submitted in support of a criminal complaint charging Martial Atchikpa (ATCHIKPA) with Access Device Fraud, in violation of Title 18, United States Code, Sections 1029(a)(3) and (a)(5); and with Conspiracy to Commit Access Device Fraud, in violation of Title 18, United States Code, Section 1029(b)(2):

   a. Title 18, United States Code, Section 1029(a)(3) generally prohibits a person who knowingly and with intent to defraud from possesses fifteen or more devices which are counterfeit or unauthorized access devices;

   b. Title 18, United States Code, Section 1029(a)(5) generally prohibits a person who knowingly and with intent to defraud effects transactions, with 1 or more access

devices issued to another person or persons, to receive payment or any other thing of value during any 1-year period the aggregate value of which is equal to or greater than $1,000;

    c. Title 18, United States Code, Section 1029(b)(2) generally prohibits a person from being a party to a conspiracy of two or more persons to commit an offense under subsection (a) of Section 1029, if any of the parties engages in any conduct in furtherance of such offense;

    d. Title 18, United States Code, Section 1029(e)(1) defines "access device" as any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, along or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument);

    e. Title 18, United States Code, Section 1029(e) defines "unauthorized access device" as any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud.

3.    The information contained herein was obtained from various sources, including other law enforcement officers, bank and/or corporate investigators, and financial and corporate records. Wherever I assert a fact in this affidavit, I either have firsthand knowledge of that fact or have discussed the matter with one of the above-listed individuals or reviewed materials in support of the fact. In addition, I have only included the facts that I believe are sufficient to

establish probable cause for the violations listed herein. I therefore have not included each and every fact known to me regarding this investigation.

## II.   PROBABLE CAUSE

4. On February 13, 2018, a Chase Bank[1] investigator contacted me regarding the suspected theft of credit cards. More specifically, various individuals had applied for approximately 145 credit cards with Chase Bank. Chase Bank had issued the credit cards and sent them to a facility for processing and mailing, but the individual customers never received the cards in the mail (or otherwise). The investigator further stated that the cards had subsequently been used by unauthorized user(s) throughout the Indianapolis, Indiana, area and elsewhere. Following this contact, I initiated an investigation, as it appeared that the cards had been diverted at some point during the processing and/or mailing phase.

5. Upon further investigation and communication with Chase Bank, I learned that from in or around June 2017, to in or around February 2018, Chase Bank sent newly issued credit cards to Pitney Bowes, a contractor that was in the business of sorting and processing business documents and letters (such as credit cards) for mailing. Pitney Bowes employed numerous individuals who assisted in the processing and sorting of business mailings. The Pitney Bowes facility at issue was (and continues to be) located in Indianapolis, Indiana. The 145 stolen credit cards were all sent to the Pitney Bowes facility.

6. Chase Bank provided me with a list of recent transactions in which the stolen credit cards were used at Indianapolis area businesses to obtain retail goods and/or services. Some of these transactions occurred between on or about January 31, 2018, and on or about March 2, 2018. The transactions, as identified by the last four digits of the stolen credit card,

---

[1] According to my training, experience, and knowledge of this investigation, I know that the deposits of Chase Bank are insured by the Federal Deposit Insurance Corporation.

included: stolen credit card #6989 at a Kroger grocery store, 5025 W. 71st Street, Indianapolis, IN 46268, on or about February 4 and 5, 2018; and, stolen credit cards #9120, #7214, #1788, #6587, #3069, and #5014, at a Walmart retail store, 4545 Lafayette Road, Indianapolis, IN 46254, between on or about January 31, 2018 and on or about March 2, 2018.

7. I subsequently obtained surveillance video and/or photographs from these nine recent transactions. In all instances, I observed a black male using what appear to be the stolen credit cards for the transactions, based on the time and location of the video and photographs. The black male (hereinafter, "Suspect #1") observed in each video and/or photo appeared to have the same physical features and characteristics.[2] On one occasion, Suspect #1 was accompanied by a black female who appeared to have red braids in her hair (hereafter, "Suspect #2"). On the February 4, 2018, Kroger transaction and the January 31, 2018, February 7, 2018, February 17, 2018, February 27, 2018, and March 2, 2018, Walmart transactions, Suspect #1 got into a vehicle which appears similar, if not identical, to a black Honda sedan.

8. After reviewing the surveillance, I contacted a Pitney Bowes investigator and provided him with some surveillance photos from some of the above-described transactions as well as the information pertaining to the black Honda sedan. The investigator later informed me that Pitney Bowes employed ATCHIKPA as a Pre-Sort Operator, i.e., an individual who operates and/or handles mail as a regular part of his or her job. The investigator also told me that Pitney Bowes personnel observed ATCHIKPA driving a black Honda Accord, Indiana license plate number 719-XX (redacted). Additionally, the investigator informed me that ATCHIKPA had a female associate named Andree Kablan ("KABLAN"), who was also employed by Pitney Bowes as a Pre-Sort Operator.

---

[2] In all of the videos and/or photos, I could observe the sex, race, hair style, or physical build of the suspect. For at least two transactions, I could observe facial features such as facial hair.

4

9. I subsequently used a law enforcement resource to obtain ATCHIKPA's driver's license photo. I then compared it, as well as his Pitney Bowes employee photo (obtained from Pitney Bowes), to Suspect #1 as depicted in the Walmart surveillance video and/or photos. ATCHIKPA appeared similar, if not identical, to the depicted Suspect #1. ATCHIKPA's physical features as listed on his driver's license were also consistent with those observed in the surveillance video and/or photos from both Kroger stores.

10. Additionally, I learned that ATCHIKPA has a checking account with Chase Bank in his name, to which a debit card is connected. I obtained ATM surveillance photographs from when ATCHIKPA used this Chase Bank debit card. I compared it to Suspect #1 depicted in the Kroger and Walmart surveillance video and/or photos. ATCHIKPA appeared similar to the depicted Suspect #1. ATCHIKPA appeared similar in appearance to Suspect #1.

11. I also reviewed vehicles registered to ATCHIKPA and learned that he owns a black 2009 Honda Accord (sedan), license plate number 719-XX, registered in Indiana. The black Honda seen on the Kroger and Walmart surveillance appeared consistent with a 2009 Honda Accord.

12. I subsequently compared KABLAN's Pitney Bowes employee photo (obtained from Pitney Bowes) to Suspect #2 who was depicted in one of the Kroger surveillance video and/or photos. KABLAN's physical features were consistent with those observed in the Kroger surveillance video and/or photographs.

13. I learned that KABLAN has a checking account with Chase Bank in her name, to which a debit card is connected. I obtained ATM surveillance photographs from when KABLAN used this Chase Bank debit card. In the photographs, KABLAN was observed with red braids

5

similar, if not identical, to those of Suspect #2. Furthermore, KABLAN was observed entering and/or exiting the passenger side of a black 2009 Honda Accord.

14. Several of the stolen credit card transactions occurred at vending machines located at Pitney Bowes. Through my training and experience and knowledge of this investigation, I believe that individuals engaged in credit card fraud use stolen credit cards at low-visibility retail locations, such as vending machines, to "test" the stolen credit card, i.e., to determine if the card is active. The Pitney Bowes investigator provided surveillance video and/or photographs from approximately four of these transactions (dates: December 22, 2017, January 26, 2018, January 27, 2018, and February 3, 2018). The individual depicted appears consistent with Suspect #1.

15. According to Pitney Bowes, ATCHIKPA started working for Pitney Bowes from at least as early as on or about June 19, 2017, and worked on third shift (i.e., 1:00 a.m. to 9:00 a.m.).

16. According to Pitney Bowes, KABLAN started working for Pitney Bowes on or about May 1, 2017, and worked on second shift (i.e., 5:00 p.m. to 1:00 a.m.).

17. Pitney Bowes compared ATCHIKPA and KABLAN's timesheets to the dates and times when approximately 131 of the 145 stolen Chase Bank credit cards were scanned[3] at Pitney Bowes. Through that comparison, Pitney Bowes determined that ATCHIKPA was working when approximately 74 of the stolen credit cards were scanned, and KABLAN was working when approximately 46 of the stolen credit cards were scanned. Additionally, Pitney Bowes determined 5 stolen credit cards were processed late on first shift (within an hour or less)

---

[3] Each stolen mail piece contains an Intelligence Mail Barcode (IMB). When the mail piece is being sorted at the Pitney Bowes facility, the IMB is scanned. The IMB scan thus provides the date and time the mail piece was on the sorting machine.

6

before KABLAN started her shift.[4] Pitney Bowes also determined that 4 stolen cards were processed on ATCHIKPA's shift while he was on vacation, and 2 stolen credit cards were processed on KABLAN's shift while she was on vacation.

18. According to Chase Bank, the approximate ship dates of the 145 stolen credit cards were between on or about June 19, 2017 (ATCHIKPA's start date), and February 9, 2018.

19. The unauthorized transactions on the 145 stolen credit cards occurred between on or about June 21, 2017, and on or about March 3, 2018, and totaled approximately $300,000.

20. One of the attempted transactions occurred on or about July 28, 2017, at a Chase Bank ATM located in Indianapolis, Indiana. The individual observed conducting the ATM transaction in the surveillance photos is a black male who arrived at the ATM machine in a black sedan.

21. None of the 145 stolen credit cards was issued in the name of ATCHIKPA or KABLAN.

22. On March 13, 2018, law enforcement officers executed federal search warrants of ATCHIKPA's residence, vehicle and person.

23. Among other things, law enforcement recovered the following:

    a. A Chase VISA card was recovered on ATCHIKPA's person that contained the name of cardholder L.R. I called Chase Bank and obtained information about that card. A Chase Bank representative told me that the customer L.R. never received this card. Chase Bank shipped the card to the customer on February 23, 2018. The first transaction occurred on March 1, 2018 in Indianapolis, Indiana. The last transaction occurred on March 13, 2018 at 2:48 a.m. at a Pitney Bowes vending machine. I learned from Pitney Bowes that

---

[4] Pitney Bowes stated the five credit cards could have very likely been left on the machine and accessible to individuals working second shift.

7

ATCHIKPA was working today (March 13, 2018) and that his shift was 1:00 a.m. until 9:00 a.m. I observed ATCHIKPA leaving Pitney Bowes at approximately 9:08 a.m.

  b. Approximately six Capital One and one Bank of America envelopes were recovered under the spare tire in ATCHIKPA's vehicle. The envelopes were sliced open and were addressed to six different people, none of whom were ATCHIKPA.

  c. A Walmart receipt was also recovered from the vehicle. The Walmart receipt shows a Chase VISA card ending in 7214 being used on February 7, 2018. I have surveillance video from Walmart on February 7, 2018, where Suspect #1 was seen conducting unauthorized transactions with a Chase VISA card ending in 7214.

  d. Law enforcement recovered a jean jacket from ATCHIKPA's residence inside the bedroom closet. The jean jacket has a distinctive American Flag on it. I know that the jacket resembles a jean jacket seen in a still surveillance photograph provided to me by Kroger from February 4, 2018 and February 5, 2018, where unauthorized transactions occurred.

24. ATCHIKPA was stopped in his vehicle after leaving work and interviewed at USPIS offices. ATCHIKPA generally stated that he understands a little English. I explained to ATCHIKPA that he should let me know if there was something that he did not understand throughout the course of the interview. Additionally, throughout the interview, every time that I would ask ATCHIKPA a question, I confirmed that ATCHIKPA understood the question that he was being asked and that ATCHIKPA responded with a yes.

25. ATCHIKPA was read his rights pursuant to *Miranda v. Arizona*. ATCHIKPA acknowledged that he understood those rights and signed a written waiver of those rights. ATCHIKPA specifically stated that he understood each line on the waiver. ATCHIKPA agreed to an interview, which was audio recorded. The following is a general summary of ATCHKPA's

interview and does not include every statement made. ATCHIKPA was shown still photographs of multiple unauthorized transactions that occurred with stolen credit cards throughout the Indianapolis area. ATCHIKPA identified himself in all but one of the photographs. ATCHIKPA also identified Andree KABLAN as being with him in a Walmart store while he was conducting a transaction. ATCHIKPA requested an attorney and the interview was concluded.

### III. CONCLUSION

26. Based on the facts set forth in this affidavit, I respectfully submit that probable cause exists to believe that between on or about June 21, 2017, and on or about March 13, 2018, in the Southern District of Indiana, MARTIAL ATCHIKPA committed Access Device Fraud, in violation of Title 18, United States Code, Section 1029(a)(3) and (a)(5), and Conspiracy to Commit Access Device Fraud, in violation of Title 18, United States Code, Section 1029(b)(2).

Postal Inspector Justin L. Adams
U.S. Postal Inspection Service

Sworn to and subscribed to before me this 13th day of March, 2018.

The Honorable Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana
9